**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| *In re:* APPLICATION OF ) <br> HULLEY ENTERPRISES LTD., ) <br> YUKOS UNIVERSAL LTD., and ) <br> VETERAN PETROLEUM LTD., FOR AN ) <br> ORDER PURSUANT TO 28 U.S.C. § 1782 ) <br> TO CONDUCT DISCOVERY FOR USE IN A ) <br> FOREIGN PROCEEDING ) | Misc. Action No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION BY HULLEY
ENTERPRISES LTD., YUKOS UNIVERSAL LTD., AND VETERAN PETROLEUM
LTD. FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY
FOR USE IN A FOREIGN PROCEEDING**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

    I.      Background on Petitioners ......................................................................... 4

    II.     1998-2004: White & Case Advises Yukos and Certain GML
           Subsidiaries .............................................................................................. 4

           A.      For Yukos, White & Case Carried Out the Yukos Shares Due
                     Diligence Project While Ms. Rutstein Was a Senior Associate
                     in the Moscow Office ................................................................. 5

           B.      Ms. Rutstein Advised Platon Lebedev on the First Tempo
                     Agreement ................................................................................... 5

           C.      Ms. Rutstein Provided Relevant Services to GML Subsidiary
                     Menatep Limited ......................................................................... 6

           D.      Ms. Rutstein Provided Relevant Services to GML Subsidiary
                     MFO Menatep ............................................................................. 7

    III.    2003-2007: The Russian Federation Unlawfully Expropriates
           Petitioners' Investments in Yukos .......................................................... 8

    IV.    2007: White & Case Voluntarily Provides Documents to the Russian
           Authorities .............................................................................................. 9

    V.     2005-2014: Numerous International Bodies Condemn Russia's
            Unlawful Expropriation, Including the Arbitral Tribunal in This Case ................ 10

    VI.    2014-Present: The Russian Federation Asks the Dutch Courts to Set
           Aside the Arbitration Awards ................................................................. 11

    VII.   2017: On Appeal, the Russian Federation Alleges That Petitioners
           Have "Unclean Hands" ........................................................................... 12

    VIII.  The Subpoenas Petitioners Seek to Issue Target Information and
           Documents That Are or May Be In the Possession of Ms. Rutstein ............ 14

ARGUMENT ....................................................................................................................... 16

    I.      Legal Standards ...................................................................................... 16

II.     Petitioners' Application Meets the Three Statutory Requirements of Section 1782................................................................................................18

    A.     Petitioners are "Interested Persons"......................................................18

    B.     The Requested Discovery Is Sought for Use in an Ongoing Proceeding Before a Foreign Tribunal.........................................................18

    C.     Ms. Rutstein "Resides" and Can Be "Found In" this District...................18

III.    Petitioners Do Not Seek To Compel the Production of Information Protected by a "Legally Applicable" Privilege .......................................................19

    A.     Because Yukos Has Ceased to Exist Under Russian Law, There Is No Longer Any "Legally Applicable" Privilege Over Ms. Rutstein's Work for, and Communications With, Yukos ..........................20

    B.     White & Case Waived Privilege Over All Documents Provided to the Russian Federation, Regardless of Which Client's "Case File" Those Documents Came From.........................................................21

    C.     Menatep Limited Has *Requested* White & Case to Produce Its "Case File".........................................................................................22

    D.     Respondent Will Not Be Able to Meet Her Burden to Show that Any Foreign Privileges Apply to the Other Documents and Information Sought ...........................................................................23

        1.     No Russian Privilege Applies Because Ms. Rutstein and Her Colleagues at White & Case Were Not "Advokats"..............24

        2.     White & Case Conceded that No Russian Privilege Applied When, in 2007, White & Case Voluntarily Provided Some of These Clients' Documents to the Russian Federation .......................................................................25

        3.     Russian Rules Against Testimony of Litigation "Representatives" Are Not "Privileges," and In Any Event Do Not Apply to Ms. Rutstein............................................25

IV.     All Four Discretionary *Intel* Factors Weigh in Favor of Granting Petitioners' Application ...............................................................................26

    A.     Neither Ms. Rutstein nor Her Former Clients Are Parties to the Dutch Appellate Proceeding ...............................................................27

    B.     The Dutch Courts Would be Receptive to United States Judicial Assistance ................................................................................27

C.      Petitioners' Application is Not an Attempt to Circumvent
        Foreign Proof-Gathering Restrictions or Other Policies...........................28

D.      Petitioners' Request is Narrowly Tailored and Is Not Unduly
        Burdensome ................................................................................................29

CONCLUSION................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*
121 F.3d 77 (2d Cir. 1997)..................................................................................23

*In re Application of Hulley Enterprises, et al.*,
18-mc-00435 (S.D.N.Y. filed Sep. 17, 2018) .........................................................3

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998), *as amended* (July 23, 1998) ...........................17, 18, 19

*Bayer AG v. Betachem, Inc.*,
173 F.3d 188 (3d Cir. 1999)..................................................................................18

*In re Biomet Orthopaedics Switzerland GmbH*,
No. 17-3787, 2018 WL 3738618 (3d Cir. Aug. 6, 2018) .......................................18

*In re Chevron Corp.*,
633 F.3d 153 (3d Cir. 2011)............................................................17, 22, 27, 29

*Commodity Futures Trading Comm'n v. Weintraub*,
471 U.S. 343 (1985).......................................................................................20, 21

*Ecuadorian Plaintiffs v. Chevron Corp.*,
619 F.3d 373 (5th Cir. 2010) ..............................................................................23

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995)................................................................................23

*Gilliland v. Geramita*,
No. 2:05CV01059, 2006 WL 2642525 (W.D. Pa. Sept. 14, 2006) ........................20

*In re Ex Parte Glob. Energy Horizons Corp.*,
647 F. App'x 83 (3d Cir. 2016) ..........................................................................29

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)................................................................................. *passim*

*In re JMP Newcor Int'l, Inc.*,
204 B.R. 963 (N.D. Ill. Bankr. 1997) ...................................................................20

*Laborers' Pension Fund v. Miscevic*,
880 F.3d 927 (7th Cir. 2018) ...............................................................................21

*Lewis v. United States*,
    2004 WL 3203121 (W.D. Tenn. Dec. 7, 2004) ....................................................................20

*Mut. Life Ins. Co. v. Armstrong*,
    117 U.S. 591 (1886)...............................................................................................................21

*Nikon Corp. v. ASML US Inc.*,
    2017 WL 4024645 (D. Ariz. 2017)........................................................................................27

*In re O'Keeffe*,
    646 F. App'x 263 (3d Cir. 2016) ...........................................................................24, 25, 29

*OAO Neftyanaya Kompaniya Yukos v. Russia*............................................................................11

*Ratliff v. Davis Polk & Wardwell*,
    354 F.3d 165 (2d Cir. 2003....................................................................................................22

*S.E.C. v. Carrillo Huettel LLP*,
    No. 13 CIV. 1735 GBD, 2015 WL 1610282 (S.D.N.Y. Apr. 8, 2015) ...........................20, 21

*United States Commodity Futures Trading Comm'n v. WeCorp, Inc.*,
    No. 2:09-CV-00153-PMP, 2010 WL 11530274 (D. Haw. Mar. 29, 2010) ...........................20

*In re Veiga*,
    746 F. Supp. 2d 27 (D.D.C. 2010) ........................................................................................19

*Veteran Petroleum Limited, Yukos Universal Limited, Hulley Enterprises Limited
v. The Russian Federation*,
    Case No. 200.197.079/01 ..........................................................................................1, 26, 28

**Statutes**

28 U.S.C. § 1782...................................................................................................... *passim*

Petitioners Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. (collectively "Petitioners") make this application pursuant to 28 U.S.C. § 1782 for leave to serve a document and deposition subpoenas on Alexandra Rutstein ("Ms. Rutstein"), a former attorney in the Moscow Office of White & Case LLP ("White & Case"), who now resides in this District. Ex. A (Shepard Decl.), Exs. 2 & 3. Petitioners' subpoenas seek evidence for use in connection with *Veteran Petroleum Limited, Yukos Universal Limited, Hulley Enterprises Limited v. The Russian Federation*, Case No. 200.197.079/01, an ongoing litigation currently pending in the Court of Appeal of The Hague (the "Dutch Appellate Proceeding").

Although Section 1782 applications are routinely considered and granted *ex parte*, Petitioners here are giving notice to Respondent (Ms. Rutstein), and to counsel for the Russian Federation. Petitioners respectfully request the Court set the following briefing schedule: 21 days from date of service for any opposition brief, and 7 days for Petitioners' reply.

## INTRODUCTION

In 2003, the Russian Federation began a systematic, unlawful, and ultimately successful campaign to destroy OAO Yukos Oil Company ("Yukos"), which was then one of the largest oil-and-gas companies in Russia and in the world. At that time, the three Petitioners together owned approximately 70% of Yukos shares.

Petitioners brought an arbitration against the Russian Federation, seeking compensation for the unlawful expropriation of their investments. An Arbitral Tribunal sitting in The Hague unanimously found that the Russian Federation's actions had violated the Energy Charter Treaty. The Tribunal awarded Petitioners damages in excess of $50 billion.

After Petitioners won their arbitrations, the Russian Federation filed suit in the District Court of The Hague (the "Dutch District Court"), seeking to have those awards set aside. The Russian Federation did not challenge the Arbitral Tribunal's factual finding that the Russian

Federation had unlawfully expropriated the assets of Yukos.  Rather, the Russian Federation challenged the awards on various other grounds including jurisdiction.  The Dutch District Court found that the Russian Federation had not agreed to be bound by the Energy Charter Treaty, and on that basis set aside the arbitral awards.  Petitioners have appealed that ruling to the Court of Appeal of The Hague (the "Dutch Appellate Court"), where the litigation is currently pending.

Petitioners' application seeks documents and deposition testimony that Petitioners may use in order to refute an argument raised by the Russian Federation in the Dutch Appellate Proceeding.  In its appellate response brief, the Russian Federation has alleged that Petitioners have "unclean hands" because of the manner in which Yukos was privatized in 1995/1996 and in which they acquired their investment in Yukos.  Therefore, the Russian Federation contends, Petitioners' arbitration awards must be set aside. Petitioners deny the "unclean hands" allegations in the strongest terms.

Petitioners expect the evidence obtained in the discovery requested herein will refute the Russian Federation's "unclean hands" allegations.  Respondent, Ms. Rutstein, was an attorney in White & Case's Moscow office who was heavily involved with Yukos-related matters in (at least) 2001 and 2002.  (Ms. Rutstein is no longer affiliated with the firm and is not licensed to practice law in Pennsylvania.  Ex. A (Shepard Decl.), ¶ 3.)  Petitioners expect Ms. Rutstein to provide relevant information on two subjects.

*First*, in 2002, Ms. Rutstein analyzed a specific document called the Tempo Agreement, which is central to the Russian Federation's "unclean hands" allegations.  In the Tempo Agreement, GML Limited (the parent of two Petitioners, formerly named Group Menatep Limited ("**GML**")) agreed to pay certain fees to a company called Tempo Finance Ltd. and to certain individuals.  The Russian Federation now alleges that this agreement is proof of bribery

by certain individuals connected to Bank Menatep in which Petitioner YUL was allegedly directly involved.  The Russian Federation further alleges that Yukos's outside advisers opined that the Tempo Agreement "made no economic sense."  Ms. Rutstein was one of Yukos's outside advisors at the time, and she briefed GML's (then) director and signatory, Mr. Platon Lebedev, on the Tempo Agreement on the day before he signed it.  Ms. Rutstein therefore has information relating to (a) whether the Tempo Agreement is in fact (as the Russian Federation now claims) evidence of bribery and (b) whether she or her colleagues at White & Case did advise, at the time of the Tempo Agreement's signing, that the Agreement "made no economic sense."

*Second*, at about the same time that Ms. Rutstein was analyzing the Tempo Agreement, White & Case was conducting an in-depth due diligence review of Yukos' privatization (the "Yukos Shares Due Diligence Project").  This project involved a detailed review of the Yukos privatization, related transactions, and subsequent transfers of shares—the exact topics that the Russian Federation raises in its "unclean hands" allegations.  Petitioners expect Ms. Rutstein can testify about the conclusions of this due diligence review, which will refute the Russian Federation's allegations that the Yukos privatization, and subsequent transfers of shares, were tainted by illegalities.

Petitioners therefore seek leave to serve a targeted subpoena to take the deposition of Ms. Rutstein relating to these matters.  Petitioners also seek leave to serve a subpoena seeking the production of any relevant documents she may have.

Petitioners recently filed a related application in the Southern District of New York, seeking similar discovery from White & Case LLP.[1]

---

[1] *In re Application of Hulley Enterprises, et al.*, 18-mc-00435 (S.D.N.Y. filed Sep. 17, 2018).

## FACTUAL BACKGROUND

**I.**    **Background on Petitioners**

Petitioners are the onetime lawful owners of a majority of Yukos's shares. Two Petitioners (Hulley Enterprises Limited ("**Hulley**") and Yukos Universal Limited ("**YUL**")) are subsidiaries of GML. GML served as a holding company for various business ventures, including the holdings in Yukos owned by Petitioners Hulley and YUL. The third petitioner here—Veteran Petroleum Limited ("**VPL**")—is owned by the Veteran Petroleum Trust. That trust was established by YUL, with the assistance of White & Case, as a pension fund for the benefit of former Yukos employees.

**II.**    **1998-2004: White & Case Advises Yukos and Certain GML Subsidiaries**

Today, White & Case represents the Russian Federation in its defense against proceedings (now stayed) that were brought by Petitioners in the United States and in the United Kingdom to recognize and enforce the Arbitral Awards.[2] Long before it represented Russia, however, White & Case represented Yukos and certain GML subsidiaries.

Beginning in 1998, White & Case's Moscow office represented the privately owned Yukos. Ex. C (Godfrey Decl.), ¶ 4. Soon after landing Yukos as a client, the firm began to represent certain subsidiaries of GML, the holding company that controlled the majority ownership of Yukos at that time. *Id.* ¶ 3. White & Case ceased representing Yukos and the GML subsidiaries in 2004. *Id.* ¶ 4.

A public filing by Yukos with the Securities & Exchange Commission ("SEC") confirms that White & Case provided legal services to Yukos at this time in connection with the legality of

---

[2]  Both of these enforcement proceedings have been stayed pending resolution of the current set-aside litigation in the Dutch Courts.

asset transfers.  In this filing, Yukos stated that White & Case was the company's "external legal advisor."  Ex. A (Shepard Decl.), Ex. 4, at 4.

Between 1998 and 2004, White & Case conducted at least four projects that are relevant to refuting the "unclean hands" allegations made in the Dutch Appellate Proceeding.  Both time sheets attached to Petitioners' application and testimony from Mr. Lebedev indicate that Ms. Rutstein was involved in these projects.

### A.     For Yukos, White & Case Carried Out the Yukos Shares Due Diligence Project While Ms. Rutstein Was a Senior Associate in the Moscow Office

At Yukos's request, White & Case conducted a "full due diligence review of the Company and its subsidiaries."  Ex. C (Godfrey Decl.), ¶ 7.  This Yukos Shares Due Diligence Project was intended to help Yukos prepare to issue American Depository Receipts ("ADRs") for trading on American securities exchanges.  *Id.*  The goal of this exercise was to do "a preparatory test run of the onerous due diligence which was expected to be undertaken by bankers, accountants, lawyers and regulators in connection with" the listing of these ADRs.  *Id.*  As part of this project, White & Case "reviewed copious documentation related, *inter alia*, to the privatization of Yukos."  *Id.*  Contemporaneous time sheets (discussed further, below) indicate that at this time, Ms. Rutstein was working in White & Case's Moscow office and was heavily involved in Yukos-related matters.

### B.     Ms. Rutstein Advised Platon Lebedev on the First Tempo Agreement

According to the Russian Federation, GML director Platon Lebedev signed an agreement with Tempo Finance on March 26, 2002.  Ex. B (Leijten Decl.), Ex. 4 (Russia's appellate brief), ¶ 534 n.825.  As described more fully below, this so-called Tempo Agreement is central to Russia's "unclean hands" allegations.  *See* Ex. B (Leijten Decl.), ¶¶ 21-24.  Under the terms of

this agreement, and another signed later that same year, GML agreed to pay certain fees to a company called Tempo Finance Ltd. and certain individuals.

The day before Mr. Lebedev signed the first Tempo Agreement, he met with Ms. Rutstein.  Ex. D (Cotlick Decl.), Ex. 2-T (Lebedev diary entry from March 25, 2002 showing meeting with Ms. Rutstein on that date).  Mr. Lebedev was later criminally prosecuted by the Russian authorities.  At his trial, he testified that he was "briefed on all potential risks regarding the [Tempo] agreement by the lawyers from White and Case . . . . and only after that the agreement among beneficiary owners of the controlling equity stake in Yukos was rendered in writing and signed."  *Id.* Ex. 1-T (trial testimony).

### C.  Ms. Rutstein Provided Relevant Services to GML Subsidiary Menatep Limited

In 2001, White & Case provided "extensive due diligence and other services" to GML subsidiary Menatep Limited.  Ex. C (Godfrey Decl.), ¶ 8.  (GML is the parent of two Petitioners (Hulley and YUL) who were at the time held the majority ownership of Yukos.)  As part of this project, "White & Case investigated the chain of title and ownership of Yukos shares."  *Id.*

Petitioners have found a White & Case invoice and time sheets in the files of GML.  These time sheets confirm Mr. Godfrey's recollection that White & Case attorneys worked to authenticate the "title" to Yukos's shares.  Ex. D (Cotlick Decl.), Ex. 4, at 6 (10 May 2001 time entry for J. Cherkassova) ("reviewing . . . documents in relation to Menatep Ltd.'s title to YUKOS shares"); *id.* at 7 (11 May 2001 time entry for J. Cherkassova) (same); *id.* at 8 (14 May 2001 time entry for J. Cherkassova) ("Research regarding documents confirming title to the securities").  Confirming the clean "title" of Yukos shares is relevant to refute the Russian Federation's current "unclean hands" allegations, which include claims that the privatization

auctions, and subsequent transfers of shares, were tainted by illegalities.  *See infra*, at 13-14 (describing "unclean hands" allegations).

Ms. Rutstein spent more time on the Menatep Limited debt restructuring project than any other White & Case attorney listed on this time sheet.  Ex. D (Cotlick Decl.), Ex. 4, at 34 (summary table showing 180.4 hours spent by Ms. Rutstein between April 1 and July 31, 2001, on the Menatep Limited debt restructuring project).  In the cover letter to the invoice, addressed to Mr. Lebedev, the managing partner of White & Case's Moscow office wrote: "Please contact Alexandra Rutstein or me if you have any questions about this statement."  *Id.* at 3.

The undersigned counsel (Steven Shepard) has been separately retained by the Liquidator of Menatep Limited (the company is now in voluntary liquidation in Gibraltar).  The Liquidator has authorized undersigned counsel to obtain and review all documents in Menatep Limited's case file.  Ex. A (Shepard Decl.), ¶ 5 & Ex. 5 (letter from Liquidator to White & Case).

### D.    Ms. Rutstein Provided Relevant Services to GML Subsidiary MFO Menatep

White & Case also provided legal services to another entity that was then owned by GML: MFO Menatep.  Specifically, White & Case advised MFO Menatep in relation to the settlement agreement entered into in 2002 with the Russian Federation's Federal Property Fund (RFFI) in relation to the privatization of shares in the Russian company OAO "Apatit." Evidence of this work is shown in another White & Case time sheet from the files of GML.  This time sheet contains entries from April 2002 (right after the first Tempo Agreement was signed) through July 2002.  Ex. D, Cotlick Decl., Ex. 5.  This time sheet shows substantial work by Ms. Rutstein on this matter.  *Id.* at 11 (reporting 38.4 hours spent by Ms. Rutstein between April 12 and June 27, 2002).  This is further evidence that Ms. Rutstein was heavily involved in matters relating to Yukos and GML (the parent of Yukos's majority shareholders Hulley and YUL) in 2002.

**III.    2003-2007: The Russian Federation Unlawfully Expropriates Petitioners'
Investments in Yukos**

Beginning in 2003, the Russian Federation launched a campaign to unlawfully destroy
and bankrupt Yukos and expropriate its assets.  Among other tactics, the Russian Federation
claimed that Yukos owed back taxes of approximately $27 billion; froze Yukos's bank accounts;
seized Yukos's assets; forced the company into bankruptcy; and transferred its assets to Russian
state-owned oil and gas companies Rosneft and Gazprom.

In November 2004, Petitioners formally notified Russia's President that his government's
expropriation was in violation of the Energy Charter Treaty.  Ex. B (Leijten Decl.), Ex. 2(a)
(Arbitral Award), ¶ 9.  Petitioners commenced their arbitrations in February 2005.  *Id.* ¶ 10.

On March 28, 2006, a Moscow Court ordered the commencement of bankruptcy
proceedings and appointed Mr. Eduard Rebgun as administrator of Yukos.  Ex. B (Leijten Decl.),
Ex. 2(a), ¶ 1075.  Mr. Rebgun promptly began to sell off Yukos's assets, at fire-sale prices, to
bidders owned or controlled by the Russian state.  *Id.* ¶ 1096 (finding that the Russian Federation
received 99.71% of the proceeds of the sales, and that the "most important assets" were
auctioned off to companies controlled by Russian state owned companies Rosneft and Gazprom).

"On 15 November 2007, the Moscow Arbitrazh Court formally endorsed all of Mr.
Rebgun's activities as receiver, closed Yukos' receivership, and ordered that Yukos be struck off
the register of legal entities.  Yukos was struck off the register of companies and its shares were
legally extinguished on 21 November 2007."  *Id.* ¶ 1099.  There is no dispute that under Russian
law Yukos ceased to exist as a company in November 2007.

Years later, after a lengthy arbitration, the Arbitral Tribunal unanimously "concluded" (in
a factual finding not now challenged by the Russian Federation in the Dutch courts) that "the
primary objective of the Russian Federation was not to collect taxes but rather to bankrupt Yukos

and appropriate its valuable assets."  Ex. B (Leijten Decl.), Ex. 2(a) (Arbitral Award), ¶ 756.

Furthermore, "[h]aving reviewed the abundant evidence in the record of the intimidation and

harassment of Yukos' senior executives, mid-level employees, in-house counsel and external

lawyers by the Russian authorities," the Arbitral Tribunal was "convinced that such intimidation

and harassment not only disrupted the operations of Yukos but also contributed to its demise and

thereby damaged Claimants' investment."  *Id.* ¶ 820.  Yukos' subsequent bankruptcy was

"initiated by the Russian Federation," and was the "final act of the destruction of the Company

by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian

State and State-owned companies Rosneft and Gazprom."  *Id.* ¶¶ 1148 & 1180; *see also* Ex. A

(Shepard Decl.), Ex. 1 (The Economist, *Baiting the Bear—The Yukos Affair* (Apr. 14, 2016)

("The Russian oil company was seized from its owners, then bankrupted and broken up after

being accused, on flimsy evidence, of tax evasion.")).

## IV.    2007: White & Case Voluntarily Provides Documents to the Russian Authorities

In May 2007—while Mr. Rebgun was acting as court-appointed administrator of Yukos,

and six months before Yukos ceased to exist under Russian law—Russian prosecutors served a

"resolution on conducting a search" on the Moscow office of White & Case.  Ex. D (Cotlick

Decl.), Ex 7-T (resolution signed by White & Case partner); *id.* Ex. 8-T ("search protocol"

describing documents provided by White & Case on May 30, 2007).  The "resolution" asked

White & Case to provide documents without regard to which client's "case file" the documents

came from, and requested (among others) the firm's communications with GML.  The firm was

asked to provide all documents relating to the Yukos Shares Due Diligence Project.  *Id.* Ex 7-T,

at 2 (seeking all documents "prepared by White & Case regarding the preliminary due diligence

of the issues relating to the purchase of the OAO NK Yukos shares by the beneficiary owners of

the said company during the privatization and subsequent transfer of said shares").  By this time,

Yukos and the GML subsidiaries were no longer clients of White & Case—that relationship had ended in 2004.  Ex. C (Godfrey Decl.), ¶ 4.

Under Russian law, if a law firm qualifies as a "formation of *advokats*," then the firm should resist the state's "resolution to conduct a search" and should demand an order of a competent court.  Ex. E (Rachkov Decl.), ¶ 30.

White & Case did not seek the judgment of a competent court.  Instead, the firm voluntarily cooperated with the Russian authorities.  *Id.* ¶ 31.  The search resolution was "made known" to White & Case partner Eric Michailov on May 22, 2007.  Ex. D (Cotlick Decl.), Ex 7-T (resolution), at 2.  When the Russian investigators arrived at the firm's office on May 30, they "invited" the firm to "surrender the documents designated in the Resolution."  *Id.* Ex. 8-T, at 2.  The firm accepted the invitation, and "surrendered" documents "voluntarily."  *Id.*  After the search, White & Case's representative stated that "all the documents related to the client Yukos and Menatep had been made available to the investigation authorities."  *Id.* at 9.   Nothing in the search resolution, or the search protocol, indicates any agreement by the Russian Federation to keep these documents confidential.

Documents provided to the Russian authorities in this search have not been produced to Petitioners.  Russia has used a handful of these documents—taken out of context and sometimes produced only in misleading excerpts—during criminal trials of persons formerly associated with GML and/or Yukos.

**V.    2005-2014: Numerous International Bodies Condemn Russia's Unlawful Expropriation, Including the Arbitral Tribunal in This Case**

Numerous bodies condemned Russia's expropriation of Yukos as unfair, unlawful, and a violation of the rights of Yukos and its owners.  In 2005, the Parliamentary Assembly of the Council of Europe found that Russia's campaign against Yukos and its owners was

10

manufactured for political reasons and a violation of human rights.[3]   In 2011, the European

Court of Human Rights found that the expropriation violated the European Convention on

Human Rights.[4]   In 2017, the Amsterdam Court of Appeal found, in a separate proceeding

brought by the former management of Yukos, that "Russian rules of law (whether or not in

respect of tax) [were] breached" by the Russian Federation and that "this took place with the

specific intent of provoking an inability to pay and, ultimately, of provoking Yukos Oil's

bankruptcy." Ex. B (Leijten Decl.), Ex. 8 (Judgment of Amsterdam Court of Appeals), at 44.

The Arbitral Tribunal in this case unanimously found that Russia's actions had "an effect

'equivalent to nationalization or expropriation,'" and therefore "breach[ed]" Russia's "treaty

obligations under Article 13 of the [Energy Charter Treaty]." *Id.* ¶¶ 1580 & 1585.  The Tribunal

awarded over $50 billion in damages.  *Id.* ¶ 1888(f) ($39.97 billion to Petitioner Hulley); *id.* Ex.

2(b), ¶ 1888(f) ($1.85 billion to Petitioner YUL); *id.* Ex. 2(c), ¶ 1888(f) ($8.2 billion to Petitioner

VPL).

**VI.    2014-Present: The Russian Federation Asks the Dutch Courts to Set Aside the
Arbitration Awards**

Unwilling to pay for its theft of Yukos and the expropriation of Petitioners' investment,

the Russian Federation promptly filed an action in the Dutch District Court, seeking to set aside

the Arbitral Awards.  Attached as Exhibit B is the Declaration of Marnix Leijten, Petitioners'

lead counsel in that proceeding and in the Dutch Appellate Proceeding.  On April 20, 2016, the

Dutch District Court issued a ruling (the "Dutch Judgment") setting aside the Awards.  Ex. B

(Leijten Decl.), ¶ 8.  The Dutch District Court found that the Energy Charter Treaty did not bind

---

[3]  Council of Europe, Parliamentary Assembly, Resolution 1418 (2005), *available at* http://assembly.coe.int/nw/xml/XRef/Xref-XML2HTML-en.asp?fileid=17293&lang=en.

[4]  *OAO Neftyanaya Kompaniya Yukos v. Russia*, Application No. 14902/0, Final Judgment ¶¶ 574-575, 656-658 (Sep. 11, 2011), *as rectified* Jan. 17, 2012), *available at* https://hudoc.echr.coe.int/eng#{%22dmdocnumber%22:[%22891996%22],%22itemid%22:[%22001-106308%22]}.

the Russian Federation, on the ground that this treaty did not provisionally apply in the Russian Federation prior to its ratification.  *Id.*  On that jurisdictional ground, the Dutch District Court set aside the Awards.  *Id.*

On July 18, 2016, Petitioners timely appealed the Dutch Judgment to the Dutch Appellate Court.  Petitioners filed their opening brief ("Statement of Appeal") on March 14, 2017.  *Id.* ¶ 10. The Russian Federation filed its appellate response brief ("Statement of Defense") on November 28, 2017.  *Id.*

**VII.   2017: On Appeal, the Russian Federation Alleges That Petitioners Have "Unclean Hands"**

In its appellate response brief, the Russian Federation raised an additional argument for setting aside the Awards—an argument not ruled upon by the Dutch District Court.  *Id.* ¶ 8. Specifically, the Russian Federation alleged that Petitioners had "unclean hands."   These "unclean hands" allegations include twenty-eight individual supposed illegalities, which Russia's appellate brief groups into four categories:

*First*, the Russian Federation alleges that certain individuals connected to Bank Menatep committed fraud, bribery, and other unlawful tactics to acquire shares in Yukos in the privatization auctions held in 1995 and 1996.  *Id.* ¶¶ 21-22.  Specifically, the Russian Federation claims that these individuals bribed certain "public officials" in order to acquire Yukos, and then paid those officials $613.5 million over the years 1996 to 2003 through a series of "sham" contracts.  *Id.* ¶ 23. Two of these supposed "sham" contracts are the "Tempo Agreements," the earlier of which was signed by Mr. Lebedev one day after being "briefed" on the Agreement by Ms. Rutstein.  *Id.*; *supra,* at 5-6.  The Tempo Agreements were entered into by GML (the parent company of petitioners Hulley and YUL), the aforementioned "public officials," and a company

called Tempo Finance Limited.  *Id.*  The Russian Federation also claims that Petitioner YUL was a party to the Tempo Agreements.  *Id.* ¶ 23.

Particularly relevant here, the Russian Federation claims that *Yukos's external advisors* (including auditors and lawyers) objected to the Tempo Agreements at the time and told Yukos that the agreements "made no economic sense."  *Id.* ¶¶ 23-24.  An expert instructed by the Russian Federation also alleges that the external advisors of the Bank Menatep individuals opined that the Tempo Agreements lacked any economic rationale. *Id.* ¶ 23.

Furthermore, the Russian Federation alleges that the individuals connected to Bank Menatep conspired with others to (a) ensure that no other genuine bidders would participate in the privatization auctions of Yukos shares, and to (b) exercise secret, *de facto* control over the auctions.  *Id.* ¶ 26.

*Second*, the Russian Federation alleges that the individuals connected to Bank Menatep concealed their control over the Yukos shares and evaded dividend-tax laws.  *Id.* ¶¶ 21, 26. Furthermore, the Russian Federation claims that certain transfers of the Yukos shares, after the auctions, had the purpose of concealing the actual ownership of the shares and violated other Russian laws.  *Id.* ¶ 26.

*Third*, the Russian Federation alleges that the Bank Menatep individuals unlawfully abused shell companies to commit further tax fraud in the Russian Federation's low tax regions. *Id.* ¶ 21.

*Fourth*, the Russian Federation alleges that these individuals obstructed tax enforcement efforts and unlawfully concealed evidence.  *Id.*

Petitioners dispute, in the strongest possible terms, all the allegations of "unclean hands" and of violations of Russian law in the course of the Yukos privatization.  These allegations are

part of the appellate record and Petitioners bring this application in order to obtain evidence to refute them.  *See* Ex. B, Leijten Decl., ¶¶ 15-20, 27-29 (describing how the information sought here may be used in the Dutch proceeding to refute the "unclean hands" allegations).[5]

**VIII.   The Subpoenas Petitioners Seek to Issue Target Information and Documents That Are or May Be In the Possession of Ms. Rutstein**

Petitioners' subpoenas will request testimony and documents relating to Ms. Rutstein's work on the Tempo Agreements and the Yukos Shares Due Diligence Project.  Ex. A (Shepard Decl.), Exs. 2 & 3 (proposed subpoenas).

As for testimony, Petitioners seek to ask Ms. Rutstein about the following:

1.   White & Case's analysis of the Tempo Agreements;

2.   Ms. Rutstein's discussion of the Tempo Agreements with Mr. Lebedev;

3.   The Yukos Shares Due Diligence Project, meaning White & Case's investigation into the Yukos privatization, the subsequent transfers of Yukos shares, and any other due diligence relating to the expected listing of ADRs on the American stock exchanges;

4.   Any other investigation of the "title" to Yukos shares (including the investigation reflected in the Menatep Limited time sheet) in which Ms. Rutstein was involved;

5.   The circumstances under which White & Case provided documents to the Russian Federation, including documents provided in connection with the May 2007

---

[5] Petitioners have requested the Dutch Appellate Court to disregard the "unclean hands" allegations because the Russian Federation did not include these allegations in its "Writ of Summons" (i.e., complaint). Ex. B (Leijten Decl.), ¶ 9.  A ruling on that request is expected on September 25, 2018.  *Id.* ¶ 12.  Even if the Dutch Appellate Court were to grant Petitioners' request to disregard the "unclean hands" allegations, the discovery sought here will remain relevant for two reasons:  First, to correct the appellate record and avoid any attempt to influence the Dutch Appellate Court using these allegations; and second, because the Dutch Appellate Court's ruling (even if favorable to Petitioners), may be appealed to—and could be reversed by—the country's Supreme Court.  *Id.* ¶¶ 16-17.

"resolution of search,"[6] *see* Ex. D (Cotlick Decl.), Ex. 8-T (search protocol describing these documents);

6. Communications with Yukos (or Yukos's court-appointed administrator, Mr. Rebgun) relating to White & Case's decision to provide these documents to the Russian Federation; and

7. Communications with Petitioners and Petitioners' representatives and agents.

Ex. A (Shepard Decl.), Ex. 3 (proposed deposition subpoena).

As for documents, Petitioners seek to subpoena Ms. Rutstein to search her "case files" (if she still has any in her possession).[7] Specifically, Petitioners seek to require Ms. Rutstein to search her "case files" for Yukos and two Yukos subsidiaries (Eastern Oil Company ("VNK") and OAO Tomskneft), and for five other GML-affiliated entities that Petitioners believe engaged White & Case on matters relevant to refuting the "unclean hands" allegations: Menatep Limited, MFO Menatep, Veteran Petroleum Trust (the trust holding shares in Petitioner VPL, which White & Case assisted in setting up[8]), and two other specific GML subsidiaries.[9] *Id.* Ex. 3.

---

[6] This is the one document request broader than the eight "case files" previously mentioned. If White & Case voluntarily provided documents to the Russian Federation from another client's "case file," then those documents should be produced in response to the subpoena.

[7] The subpoena defines "case file" to include: engagement letters; time sheets and invoices; hard-copy documents including documents obtained from the client and from third parties; memoranda; transaction documents; communications with the clients; internal communications between White & Case attorneys relating to work for the client; and communications with third parties made on the client's behalf. "Case file" is further defined to include a search of hard-copy files and electronic documents, including emails. "Case file" also includes any of the above documents that were once in White & Case's possession, were seized by the Russian Federation, and were then returned at any time to White & Case.

[8] Ex. C (Godfrey Decl.), ¶ 9.

[9] The other two GML subsidiaries Petitioners believe may have engaged White & Case on relevant projects are Chemical & Mining Universal Limited and Pecunia Universal Limited. The subpoena also seeks documents from any of Ms. Rutstein's "case files" for Petitioners and GML, although Petitioners expect that there are no such case files because, in previous correspondence,

Petitioners do not currently have possession of or access to the information and documents sought in this application.  There is no mechanism under Dutch discovery law that would allow Petitioners to obtain this discovery from Ms. Rutstein, who is a non-party to the Dutch Appellate Proceeding.  Ex. B (Leijten Decl.), ¶ 29.  This application is not an attempt to "circumvent" any Dutch rules of procedure, privilege, or evidence.  *Id.* ¶ 18.  Dutch courts routinely allow evidence collected through Section 1782 applications to be used in Dutch proceeding.  *Id.* ¶ 19.

## ARGUMENT

### I.  Legal Standards

The statute pursuant to which this discovery is sought, 28 U.S.C. § 1782, "is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  The statute provides, in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.
>
> A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C. § 1782(a).

The purpose of Section 1782 is "to facilitate the conduct of litigation in foreign tribunals, improve international cooperation in litigation, and put the United States into the leadership

---

White & Case has stated that it has no record of GML or Petitioners as clients.  *See* Ex. D (Cotlick Decl.), Ex. 6.

position among world nations in this respect." *In re Bayer AG*, 146 F.3d 188, 191–92 (3d Cir. 1998), *as amended* (July 23, 1998).

If Respondent or the Russian Federation were to oppose the discovery sought here, the burden would be on that party to show "facts warranting the denial of" the application. *In re Chevron Corp.*, 633 F.3d 153, 162 (3d Cir. 2011).

In considering Petitioners' application, the Court first considers whether three statutory requirements are met: (1) the application must be made by an "interested person" in the foreign proceeding; (2) the discovery "must be for use in a proceeding before a foreign tribunal"; and (3) the person from whom discovery is sought must "be a resident of or be found in the district in which the application is filed." *In re Bayer AG*, 146 F.3d at 193. These requirements are "modest." *Id.* at 195. It is not necessary for the Court to make any finding that the testimony and documents sought herein would be "discoverable in the foreign jurisdiction." *Id.* at 193.

The Court next considers four "discretionary factors" set forth in the Supreme Court's *Intel* decision. 542 U.S. at 247. Those factors are:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding";
>
> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";
>
> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and
>
> (4) whether the request is "unduly intrusive or burdensome."

*Intel*, 542 U.S. at 264-65; *see In re Chevron Corp.*, 633 F.3d 153, 162 (3d Cir. 2011) (discussing and applying these four *Intel* factors to affirm district court's grant of § 1782 application).

Because Section 1782 expressly refers to the Federal Rules of Civil Procedure, "under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute."  *In re Bayer AG*, 146 F.3d at 195; *see also Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 192 (3d Cir. 1999) (holding that Section 1782 "incorporates by reference the scope of discovery permitted by the Federal Rules of Civil Procedure").

## II.    Petitioners' Application Meets the Three Statutory Requirements of Section 1782

### A.    Petitioners are "Interested Persons"

Because Petitioners are parties to the Dutch Appellate Proceeding, they qualify as "interested persons" for purposes of Section 1782.  *Intel*, 542 U.S. at 256 ("[L]itigants are included among . . . the 'interested person[s]' who may invoke § 1782").

### B.    The Requested Discovery Is Sought for Use in an Ongoing Proceeding Before a Foreign Tribunal

Evidence obtained pursuant to this application is sought "for use" in the Dutch Appellate Proceeding, which qualifies as a "proceeding in a foreign . . . tribunal."  *Intel*, 542 U.S. at 257-58.  As attested by the lead lawyer for Petitioners in the Dutch proceeding, the evidence sought here may be used to refute the Russian Federation's "unclean hands" allegations.  Ex. B (Leijten Decl.), ¶¶ 16-17, 27-28.  The Dutch Appellate Court will receive this evidence.  *Id.* ¶¶ 18-20, 28.

### C.    Ms. Rutstein "Resides" and Can Be "Found In" this District

Petitioners' application meets the third statutory criterion because Ms. Rutstein resides and can be found in this District.  Ex. A (Shepard Decl.), ¶ 4.  This criterion is met even though it could be argued that some of this information belongs not to Ms. Rutstein but instead to her former clients.  The only relevant question is whether Ms. Rutstein resides here. *In re Biomet Orthopaedics Switzerland GmBh*, No. 17-3787, 2018 WL 3738618, at *4 (3d Cir. Aug. 6, 2018) (vacating district court's denial of Section 1782 application that sought to subpoena documents

from two Philadelphia law firms, and holding that the statute "contains no express mandate to consider a principal-agent relationship, or whether documents being held by the subpoenaed party belong to a foreign party" (citation omitted)).

### III.   Petitioners Do Not Seek To Compel the Production of Information Protected by a "Legally Applicable" Privilege

Section 1782 provides that "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any *legally applicable* privilege."  28 U.S.C. § 1782(a) (emphasis added). However, this Circuit does not consider an absence of "privilege" issues to be a statutory "requirement" for granting a Section 1782 application.  *See In re Bayer AG*, 146 F.3d at 193 (listing the three "requirements" discussed above, and not mentioning privilege).

Moreover, the statute authorizes this Court to order that discovery "shall be taken . . . in accordance with the Federal Rules of Civil Procedure."  28 U.S.C. § 1782(a); *In re Bayer AG*, 146 F.3d at 195.  Under the Federal Rules, Respondent may not make "blanket or categorical claims of privilege; rather, the law 'requires a showing that the privilege applies to each communication for which it is asserted.'"  *In re Veiga*, 746 F. Supp. 2d 27, 33 (D.D.C. 2010) (after granting Section 1782 application, court required respondent to produce detailed privilege log describing the documents withheld, and then granted petitioners' motion to compel production of most documents).

Petitioners therefore respectfully submit that this Court should exercise its discretion to permit Petitioners to serve the attached subpoenas.  For the reasons stated below, the information sought herein is not protected by any "legally applicable privilege."  28 U.S.C. § 1782(a).

**A.      Because Yukos Has Ceased to Exist Under Russian Law, There Is No Longer Any "Legally Applicable" Privilege Over Ms. Rutstein's Work for, and Communications With, Yukos**

There is no "legally applicable" privilege that Ms. Rutstein may assert with regard to her work for, and communications with, Yukos and Yukos's subsidiaries.  Attorney-client privilege is held by the management of the corporation.  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348-49 (1985).  But Yukos has no management because Yukos ceased to exist, as a matter of Russian law, in November 2007.  Therefore, there is no client left to assert any privilege over Ms. Rutstein's information.

"[A] dissolved or defunct corporation retains no privilege."  *S.E.C. v. Carrillo Huettel LLP*, No. 13 CIV. 1735 GBD, 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015) (Francis, M.J.) (collecting authorities and ordering attorneys to produce communications with now-defunct clients); *United States Commodity Futures Trading Comm'n v. WeCorp, Inc.*, No. 2:09-CV-00153-PMP, 2010 WL 11530274, at *2 (D. Haw. Mar. 29, 2010) (same); *Gilliland v. Geramita*, No. 2:05CV01059, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006) (same); *accord Lewis v. United States*, 2004 WL 3203121 (W.D. Tenn. Dec. 7, 2004) (attorney-client privilege does not extend beyond the death of a corporation); *In re JMP Newcor Int'l, Inc.*, 204 B.R. 963 (N.D. Ill. Bankr. 1997) (attorney-client privilege of bankrupt entity ceased to exist upon confirmation of a reorganization plan).  These courts have based their reasoning on the Supreme Court's analysis of the privilege in *Weintraub*, 471 U.S. 343.

In *Weintraub*, the Supreme Court held that the trustee in bankruptcy, rather than the officers of the debtor corporation, had the right to exercise or waive the attorney-client privilege on behalf of the debtor corporation, even as to confidential communications that occurred prior to the filing for bankruptcy.  *Id.* at 351-58.  It follows, from that holding, that a *completely defunct* corporation (with no management left to it, and no bankruptcy trustee either) no longer

has any right to exercise or assert the attorney-client privilege.  *See Carrillo Huettel*, 2015 WL 1610282, at *2-*4 (Francis, M.J.) (describing the "weight of authority" following *Weintraub*).

If there were any applicable privilege over these documents, it would be perverse to allow Respondent, Ms. Rutstein, or her former law firm (White & Case) to invoke it. Respondent would be making use of the privilege once owed to a former, now-slain client (Yukos) in order to assist that client's slayer (the Russian Federation, White & Case's current client) to escape from the justice sought by Yukos' former majority shareholders.  If Yukos had survived the Russian Federation's onslaught, there can be no doubt that its management would support Petitioners (the company's majority shareholders) in seeking compensation for the assets expropriated from the company, and would waive whatever privilege were necessary in order to aid Petitioners in that effort.  It would be a miscarriage of justice to allow the Russian Federation to benefit from its killing of Yukos by allowing Yukos's privilege to prevent Petitioners from accessing Yukos's "case file."   In analogous situations, federal courts will not hesitate to set aside binding documents such as ERISA beneficiary forms and insurance contracts, in order to avoid such a perverse result.  *See, e.g.*, *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 934 (7th Cir. 2018) (though ERISA preemption is "expansive," it does not preempt state "slayer statute" because "Congress could not have intended ERISA to allow one spouse to recover benefits after intentionally killing the other spouse"); *Mut. Life Ins. Co. v. Armstrong*, 117 U.S. 591, 600 (1886) ("It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had feloniously taken.").

### B.    White & Case Waived Privilege Over All Documents Provided to the Russian Federation, Regardless of Which Client's "Case File" Those Documents Came From

In May 2007, White & Case voluntarily produced documents to the Russian Federation in response to the "resolution on conducting a search."  *Supra*, at 9-10.  The search "resolution"

was broad and did not discriminate between the firm's clients, instead seeking all documents "prepared by White & Case"—for *any* client—"regarding the preliminary due diligence of the issues relating to the purchase of the OAO NK Yukos shares by the beneficiary owners of the said company during the privatization and subsequent transfer of said shares."  Ex. D (Cotlick Decl.), Ex. 7-T, at 2.  In response to this request, the firm "surrendered voluntarily" documents belonging to Yukos and to other clients.  Ex. D (Cotlick Decl.), Ex. 8-T ("search protocol" describing an eight-page list of documents "surrendered voluntarily" to the Russian Federation); *see* Ex. E (Rachkov Decl.), ¶ 31 (explaining that these documents indicate that White & Case voluntarily complied with the request).

If there was any privilege Ms. Rutstein could assert here, that privilege was lost when White & Case voluntarily surrendered these documents.  There are no indications in the "resolution on conducting a search" or the "search protocol" that the Russian Federation shared any common interest with Yukos or other firm clients, nor that the state made any promises of confidentiality.  Therefore, White & Case's voluntary disclosure waived privilege over all the information voluntarily provided to the Russian Federation.  *In re Chevron Corp.*, 633 F.3d at 165 (affirming grant of Section 1782 application because respondents' voluntary disclosure of documents to Ecuadorean court-appointed expert Richard Cabrera waived privilege over those documents); *see also Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003) (because foreign client had "voluntarily authorized Davis Polk to send the documents to the SEC," Davis Polk could not invoke privilege in order to refuse producing those documents in response to Section 1782 subpoena).

### C.    Menatep Limited Has *Requested* White & Case to Produce Its "Case File"

Petitioners' subpoenas also seek information from Ms. Rutstein relating to her work for, and communications with, another former White & Case client, the GML subsidiary Menatep

Limited.  As described above, in 2001 Ms. Rutstein performed work for Menatep Limited in a debt restructuring project that involved an investigation regarding the clean "title" to Yukos shares.  *See supra*, at 6-7.  Menatep Limited is now in voluntary liquidation.  Its Liquidator has requested that White & Case disclose its entire "case file" to the undersigned counsel for Petitioners.  Ex. A (Shepard Decl.), Ex. 5 (letter from Liquidator).  Therefore, privilege will be no barrier to the production, to undersigned counsel, of information relating to Ms. Rutstein's work for Menatep Limited.[10]

### D.     Respondent Will Not Be Able to Meet Her Burden to Show that Any Foreign Privileges Apply to the Other Documents and Information Sought

Petitioners expect that Ms. Rutstein or White & Case (which firm currently represents the Russian Federation) may attempt to assert privilege under Russian law.  However, Respondent and White & Case are unlikely to meet their heavy burden of coming forward with "authoritative proof that [the] foreign tribunal"—here, the Dutch Appellate Court—"would reject the evidence . . . because of the alleged [foreign] privilege."   *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 80 (2d Cir. 1997); *accord Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) (finding that respondent's expert affidavit on Ecuadorean privilege law did not meet respondent's burden of "authoritative proof" because it did not "point[] to any judicial, executive, or legislative declaration that clearly demonstrates that that allowing discovery in this case would offend Ecuadorian judicial norms"); *see also Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995).

---

[10] White & Case has represented to the undersigned counsel that the firm's engagement by Menatep Limited was a "joint representation" involving another client, whose name the firm refuses to disclose. Ex. A (Shepard Decl.), ¶ 6.  Therefore, it is possible that White & Case may assert some privilege on behalf of that other unknown client.  Days before this filing (and two months after receiving the Liquidator's letter), White & Case also demanded further documentation regarding the manner in which the Liquidator was appointed.  *Id.* ¶ 7.

The Third Circuit, like the Second and Fifth Circuits, has held that "district courts are discouraged from engaging in the interpretation of foreign law when conducting a Section 1782 analysis" and therefore should require "authoritative proof" from a respondent seeking to invoke foreign law to bar the discovery.  *In re O'Keeffe*, 646 F. App'x 263, 267 (3d Cir. 2016) (affirming district court's denial of respondent's motion to quash subpoena served under Section 1782, because respondent had failed to "present 'authoritative proof' that the foreign court would reject the evidence" (citing and quoting, with approval, the Second Circuit's decision in *Euromepa*, 51 F.3d at 1099)).

Here, there is no applicable foreign privilege.  Petitioners' Dutch appellate counsel attests in his declaration that there is no rule of discovery or privilege that would prevent the Dutch courts from considering the evidence sought by Petitioners here.  Ex. B (Leijtens Decl.), ¶¶ 18-20, 28.

Moreover, even if Respondent or White & Case were to submit an affidavit of an expert on Russian law, that affidavit will not contain the necessary "authoritative proof" of Russian privilege.  As shown in the attached declaration of Dr. Ilia Rachkov (an expert on Russian law), no Russian privilege applies here, for three reasons: (1) Ms. Rutstein and her colleagues at White & Case were not the kind of lawyers (*advokats*) who may invoke Russian privilege; (2) the firm conceded as much when it voluntarily produced documents to the Russian prosecutors in 2007 without first demanding a court order; and (3) two Russian procedural rules, which bar litigation "representatives" from being compelled to testify, are not implicated here.

### 1.    No Russian Privilege Applies Because Ms. Rutstein and Her Colleagues at White & Case Were Not "Advokats"

The Russian equivalent of attorney-client privilege is "*advokat* secrecy."  Ex. E (Rachkov Decl.), ¶¶ 6-9.  This doctrine does not apply to all lawyers.  Only registered Russian *advokats*

can assert "*advokat* secrecy."  *Id.*  Ms. Rutstein has never been an *advokat.*  *Id.* ¶ 28.  Of all 28 White & Case attorneys named on the time sheets in GML's files, only two are even possibly an *advokat.*[11]  Therefore, Russian attorney-privilege does not apply to the information sought here. *Id.*

### 2.     White & Case Conceded that No Russian Privilege Applied When, in 2007, White & Case Voluntarily Provided Some of These Clients' Documents to the Russian Federation

White & Case's voluntary disclosure of many of the documents sought here amounts to a concession by the firm that no "*advokat* secrecy" applies to these documents.  *See* Ex. D (Cotlick Decl.), Ex. 8-T ("search protocol" with an eight-page list of documents "surrendered voluntarily" to the Russian Federation).

If the firm had qualified as a "formation of *advokats*," then the firm could have refused the search "resolution" and demanded an order of a competent judge.  Ex. E (Rachkov Decl.), ¶¶ 30-31.  If the firm had been a "formation of *advokats*," then the firm would have had an ethical obligation to take this step (of demanding a court order) before relinquishing client documents to an adverse party.  *Id.*  Instead, the firm voluntarily provided the documents without demanding a court order.  *Id.* (explaining that the search protocol indicates that no court order was demanded by White & Case).  This action amounts to a concession by White & Case that no Russian privilege (i.e., no "*advokat* secrecy") applies to these documents.

### 3.     Russian Rules Against Testimony of Litigation "Representatives" Are Not "Privileges," and In Any Event Do Not Apply to Ms. Rutstein

There are two Russian procedural rules that prevent a litigation "representative" of a

---

[11] Because the White & Case time sheets do not contain the full names of the timekeepers, it is not possible based on publicly available information to confirm whether these two attorneys were on the register.  Ex. E (Rachkov Decl.), ¶ 27.  In any event, these two timekeepers spent very little time on the projects shown on the time sheets.  *See* Ex. D (Cotlick Decl.), Ex. 4 (2001 Menatep Limited Timesheet) (no time shown for either attorney); *id.* Ex. 5 (2002 MFO Menatep Timesheet) (1.6 hours by "O. Okouneva" and 9 hours by "A Shashkova").

party from being called as a witness, in Russian court, to give oral "testimony" about matters "that became known to them in connection with the performance of the duties of representative." *Id.* ¶¶ 19-24 (quoting rules).  These rules apply to all "representatives" in litigation, even if they are not lawyers.  These rules do not bar Petitioners' requested discovery, for three reasons.

*First*, these procedural rules are not properly considered as "privileges" for the purposes of Section 1782.  At most, these rules would prevent the deposition testimony from being used in a *Russian* court.  *Dutch* courts, in which this deposition testimony would be used, would accept such testimony as evidence.  Ex. B (Leijten Decl.), ¶¶ 18-20, 28.

*Second*, as to any documents in Ms. Rutstein's possession, these rules cannot apply.  The rules only bar *oral testimony* and say nothing about document production.  Ex. E (Rachkov Decl.), ¶ 24 (discussing 2012 decision by Russian Supreme *Arbitrazh* Court compelling law firm to produce documents).

*Third*, as to the requested deposition of Ms. Rutstein, these rules do not apply here because the rules only bar testimony that (a) relates to a prior civil or criminal "proceeding" in which the witness served as a party's "representative"; and that (b) relates to information that the witness learned "in connection with" his or her role in representing the client in that prior litigation.  *Id.* ¶ 23. The rules therefore do not bar out-of-court advisors (like Ms. Rutstein) from testifying about their work.  *Id.* (discussing a Russian court decision allowing a "representative" to be questioned about matters unrelated to any litigation representation).  Therefore, these laws do not bar the discovery sought here.  *Id.* ¶¶ 37-41.

## IV.    All Four Discretionary *Intel* Factors Weigh in Favor of Granting Petitioners' Application

Where, as here, an application meets the statutory requirements, courts proceed to consider the four discretionary factors outlined by the Supreme Court in *Intel* to determine

whether to grant the application.  *See In re Chevron Corp.*, 633 F.3d at 162 (discussing and applying these four *Intel* factors to affirm district court's grant of § 1782 application).

### A.        Neither Ms. Rutstein nor Her Former Clients Are Parties to the Dutch Appellate Proceeding

The first discretionary factor is whether the "person from whom discovery is sought is a participant in the foreign proceeding."  *In re Chevron Corp.*, 633 F.3d at 161.  If the person "is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent" because the "foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence."  *Intel*, 542 U.S. at 244.

Here, neither Ms. Rutstein nor her former clients are parties to the Dutch Appellate Proceeding.  Ex. B (Leijten Decl.), ¶ 29.  White & Case is not counsel of record to the Russian Federation in the Dutch courts (nor in the underlying arbitration) and neither the firm nor its former clients are subject to the jurisdiction of the Dutch courts for purposes of obtaining documents.  *Id.*  Therefore, the first *Intel* factor supports this application.

### B.        The Dutch Courts Would be Receptive to United States Judicial Assistance

The second discretionary factor requires the court to evaluate the receptivity of the foreign tribunal to United States judicial assistance and evidence obtained in Section 1782 discovery.  *In re Chevron Corp.*, 633 F.3d at 162.  As Mr. Leijten attests, Dutch laws permit the submission of evidence collected pursuant to Section 1782 and Dutch courts routinely admit such evidence.  Ex. B (Leijten Decl.), ¶¶ 15-19.  Moreover, federal courts in this country have found that the Dutch judicial system is receptive to United States aid.  *See, e.g.*, *Nikon Corp. v. ASML US Inc.*, 2017 WL 4024645, at *3 (D. Ariz. 2017).  Therefore, the second discretionary *Intel* factor supports granting Petitioners' application.

### C.    Petitioners' Application is Not an Attempt to Circumvent Foreign Proof-Gathering Restrictions or Other Policies

The third discretionary factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.

That is not the case here.  As noted, there is no Dutch rule (of procedure, evidence, or privilege) that bars Petitioners from obtaining the discovery sought in this application.  Ex. B (Leijten Decl.), ¶ 18.  In a word, Petitioners are not "circumventing" the Dutch system.  *Id.*

Petitioners expect that Respondent (or White & Case) may attempt to assert that some of the information sought here is protected by *Russian* "commercial secret" laws, which Russian law firms sometimes include in their engagement letters with clients.  *See* Ex. E (Rachkov Decl.), ¶¶ 10-18 (discussing these laws).   Petitioners are not seeking to circumvent those laws, either.  *First*, the "contractual secrecy" law no longer applies after the client ceases to exist, and therefore has no bearing on the documents in the case files of Yukos and Yukos's subsidiaries. *Id. Second*, these laws are narrowly drawn and apply only to "new decisions and technical knowledge," akin to what United States courts refer to as "trade secrets."  *Id.* ¶¶13-15 (in order to qualify for trade secret protection under Russian law, "[t]he information must also have an actual or potential commercial value because it is unknown to third-parties").  It is highly doubtful that the Yukos Shares Due Diligence Project documents contain any information that ever qualified for "trade secret" protection—let alone continue to qualify for that protection, fourteen years or more after they were created.  Moreover, Petitioners are not seeking any such technical knowledge from Ms. Rutstein.  *Third*, the Russian "trade secret" laws are not absolute; Russian law permits courts to order the disclosure of even "trade secrets" if that information is necessary and relevant to evaluate the parties' claims in litigation.  *Id.* ¶¶ 16-17.

**D.      Petitioners' Request is Narrowly Tailored and Is Not Unduly Burdensome**

The final discretionary factor is whether the requested discovery is "unduly intrusive or burdensome."  *In re Chevron Corp.*, 633 F.3d at 164.  The Court's "assessment of the fourth factor is virtually identical to the familiar 'overly burdensome' analysis that is integral to the Federal Rules."  *In re Ex Parte Glob. Energy Horizons Corp.*, 647 F. App'x 83, 86 (3d Cir. 2016).

As an initial matter, this factor is relevant only insofar as *Respondent* (Ms. Rutstein) claims that the subpoenas are burdensome.  The Russian Federation would not "have standing to challenge the request as burdensome," since the "burden falls on" Ms. Rutstein.  *In re O'Keeffe*, 646 F. App'x 263, 268 (3d Cir. 2016) (in Section 1782 application seeking documents held by accountant, affirming district court's denial of accountant's client's motion to quash, in part because the client lacked standing to claim any "burden" on accountant).

Petitioners respectfully submit that any concerns about burden are best deferred until after the Court authorizes Petitioners to serve the requested subpoenas, so that Petitioners and Respondent may attempt to meet and confer over any concerns regarding burden.

On its face, Petitioners' request is not unduly burdensome.  Petitioners' subpoenas ask for a one-day deposition and the production of responsive documents (if any) that remain in Ms. Rutstein's possession.

Moreover, Petitioners have not sought wholesale production of the entire "case files" of all clients Ms. Rutstein may have once represented.  Instead, Petitioners have specifically targeted those categories of documents that are most likely to refute the "unclean hands" allegations.  *Supra*, at 14-15 (describing the documents sought).

The burden of this discovery is reasonable in light of the obvious relevance to refuting the Russian Federation's "unclean hands" allegations.  As part of those allegations, the Russian

29

Federation claims that the "external advisors" of Yukos opined, at the time, that the Tempo Agreements "made no economic sense." Ex. B (Leijten Decl.), ¶¶ 23-24. White & Case was one of Yukos's "external legal advisor[s]" at this time, and Ms. Rutstein briefed Mr. Lebedev on the first Tempo Agreement one day before he signed it. Ex. A (Shepard Decl.), Ex. 4 (Yukos SEC filing), at 4; Ex. D (Cotlick Decl.), Ex. 1-T (trial transcript). The discovery sought here is thus likely to refute the allegation that Yukos's external advisors opposed the Tempo Agreements.

Furthermore, any burden on Ms. Rutstein should be weighed against the large fees that her law firm earned during six years of representing Yukos and GML subsidiaries. *See* Ex. D (Cotlick Decl.), Ex. 4, at 30 (firm charged $208,626 for work done in three months of 2001); *id.* Ex. 5, at 11 ($50,707 for work done in three months of 2002). It is not "undue" that Petitioners now ask Ms. Rutstein to incur the burden of producing to Petitioners the information that Petitioners' companies paid for in the first place.

## CONCLUSION

For the reasons stated above, Petitioners respectfully request that this Court grant Petitioners' application for discovery pursuant to 28 U.S.C. § 1782 and authorize Petitioners to issue and serve the attached subpoenas on Ms. Rutstein.

Respectfully submitted,

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Dated: September 21, 2018

By: _____
William T. Hangley (I.D. No. 03533)
Jason A. Levine (I.D. No. 306446)
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
whangley@hangley.com
jlevine@hangley.com

30

SUSMAN GODFREY LLP

Jacob Buchdahl
  (*pro hac vice* application pending)
Steven M. Shepard
  (*pro hac vice* application pending)
1301 Ave. of the Americas Floor 32
New York, NY
(212) 336-8330
jbuchdahl@susmangodfrey.com
sshepard@susmangodfrey.com

*Counsel for Petitioners*